**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1139-17T4
     A-1222-17T4[1]

STATE OF NEW JERSEY,

   Plaintiff-Respondent,

v.

NYJE JOHNSON,

   Defendant-Appellant.

_____

STATE OF NEW JERSEY,

   Plaintiff-Respondent,

v.

JEAVONTE M. DENNIS, a/k/a
JAMIL JEVONTE DENNIS,

   Defendant-Appellant.

_____

Submitted December 5, 2019 – Decided March 30, 2020

---

[1] We consolidate the appeals for this opinion.

Before Judges Nugent, Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 15-08-1070.

Joseph E. Krakora, Public Defender, attorney for appellant Nyje Johnson (Stefan Van Jura, Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Jeavonte Dennis (Frank M. Gennaro, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Robert John Wisse, Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

Co-defendants, Jeavonte Dennis and Nyje Johnson, both black, appeal from judgments of conviction entered after a jury convicted them of crimes stemming from the shooting death of a young teenage girl and the wounding of another, and a judge sentenced them to, respectively, aggregate prison terms of forty-five and twenty-two years. The principal issue we must decide is whether co-defendants are entitled to a new trial because the prosecutor exercised his peremptory challenges to exclude the black potential jurors.[2] When the issue

---

[2] For clarity, we refer only to Dennis and Johnson collectively as co-defendants. Although others were indicted with Dennis and Johnson, only Dennis and Johnson were prosecuted in the trial that is the subject of this appeal.

arose during co-defendants' trial, the court determined co-defendants had carried their initial burden of making a prima facie showing the prosecutor had exercised his peremptory challenges on constitutionally-impermissible grounds. The court further determined, however, that the prosecutor's proffered reasons for excusing the jurors were race neutral, and co-defendants had failed to sustain their ultimate burden of proving the prosecutor exercised his peremptory challenges in an unconstitutional manner.

Although we conclude the trial court erred in its analysis, we need not remand for an amplification of its decision because we also conclude the prosecutor failed to carry his burden of rebutting co-defendants' prima facie case by showing genuine and reasonable grounds for believing the prospective black jurors he excused had individual or personal bias that would make excusing them reasonable and desirable given the aim of empaneling a fair and impartial jury. For this reason, we reverse and remand for a new trial.

## I.

### A.

In August 2015, a Bergen County grand jury returned a twenty-five-count indictment against co-defendants, others who participated in the shooting, and others who hindered the ensuing investigation. Co-defendants were charged

A-1139-17T4

with first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) or (2) (count one); first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a) (count two); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count eight); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count nine).

Co-defendant Dennis was also charged with the third-degree crimes of possession of a controlled dangerous substance (CDS), heroin, N.J.S.A. 2C:35-10(a)(1) (count fifteen); possession of a CDS, heroin, with intent to distribute, N.J.S.A. 2C:35-5(b)(3) (count sixteen); possession of a CDS, heroin, with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7 (count seventeen); and second-degree possession of a CDS, heroin, with intent to distribute within 500 feet of public property, N.J.S.A. 2C:35-7.1 (count eighteen).

Following the indictment, co-defendants filed motions to suppress the statements they had given to police. The court denied the motions.

The case proceeded to trial against co-defendants on the charges of murder, attempted murder, conspiracy to commit murder, and the two weapons offenses. The jury convicted Dennis on those counts. The jury acquitted

4

Johnson of murder and attempted murder, but convicted him of aggravated manslaughter, conspiracy to commit murder, and the weapons offenses. Following the verdicts, Dennis entered a guilty plea to possession of CDS, heroin, N.J.S.A. 2C:35-10(a)(1), which was amended to a disorderly persons offense.

The trial court sentenced Dennis to a forty-five-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count one, murder. On count two, attempted murder, the court imposed a concurrent twenty-five-year prison term subject to NERA. The court merged the conspiracy and weapons counts, three, eight, and nine. On the disorderly persons CDS offense, the court imposed a concurrent six-month sentence. The court also imposed appropriate penalties and assessments.

The trial court sentenced Johnson on the lesser-included offense of aggravated manslaughter, count one, to a twenty-two-year prison term subject to NERA. The court merged the conspiracy and weapons counts, three, eight, and nine, and imposed appropriate penalties and assessments.

B.

Late on a September night in 2014, while fourteen-year-old Nazerah Bugg and fifteen-year-old Nylijah Albert were talking to several friends in front of a

"chicken" store on a Paterson street, the group was engulfed in a hail of gunfire. One bullet tore through the left side of Nazerah's back and exited through the upper right front of her chest. From the bullet's trajectory, the medical examiner concluded Nazerah was either ducking or running when she was shot. She died from the damage the bullet did to her heart.

Nylijah was also shot in the back. She was hospitalized for approximately one month and underwent surgery but survived. The bullet could not be removed from where it had lodged in her body.

Law enforcement officers recovered thirteen forty-caliber shell casings, two nine-millimeter shell casings, projectiles, and projectile fragments from the shooting scene. Two men had caught Nylijah's attention immediately before the shooting started: a short, masked man dressed in dark clothing crossing the street and walking toward her, and a taller man standing by a car a short distance away. She initially thought she recognized the taller man, but later decided she was mistaken. Homicide detectives developed the case the State presented at trial through interviews and through the custodial interrogation of those involved, including three statements the detectives took from co-defendant Dennis and three statements they took from co-defendant Johnson.

According to the State's proofs, the shooting was gang-related. The gangs involved were the Up the Hill gang, whose territory was in Paterson on the south side of the Passaic River, and a rival gang, Down the Hill, whose territory was in Paterson on the north side of the Passaic River.[3] Earlier in the day, a man named Dion Eaton was shot in the chest as he and five other Up the Hill gang members were leaving the back yard of one of their homes. Co-defendant Johnson was one of the Up the Hill members.

Following the afternoon shooting of Dion, gang leaders Baseem Williams and Shakeem Ricks met with other Up the Hill members, urged them to retaliate, and armed them with handguns. Later that night, co-defendants, along with Devonte Lewis and Quajeir Culbreath, rode in Tyheem Mayfield's black BMW to the chicken store with the intention of shooting members of the Down the Hill gang. Both co-defendants admitted possessing handguns and exiting the vehicle near the chicken store with Lewis and Culbreath. Dennis told detectives he had a 380-caliber revolver but claimed that he did not shoot it.

---

[3] The testimony is not consistent as to whether co-defendants and their fellow gang members involved in the shooting were members of the Up the Hill gang, a gang known as Up Top, or a gang known as 230. Nor is the testimony consistent as to whether Up Top and 230 were factions of Up the Hill or separate gangs. Because the distinction is not material to the issues on this appeal, for clarity we refer to Up the Hill to include Up the Hill, Up Top, 230, and their members.

According to Dennis, Lewis had both 40-caliber and nine-millimeter handguns in his possession. Dennis claimed he was "creeping" down the street to avoid detection just before the shooting occurred, but when Culbreath and Lewis fired their weapons, he ran away. After the shooting, another Up the Hill member collected the guns and threw them into the Passaic River.

Co-defendant Johnson told detectives during his first interview that he, Lewis, and a few others were shot at earlier on the same day that Nazerah Bugg and Nylijah Albert were shot. He also said there was a feud between the Up the Hill gang and the Down the Hill gang.

During Johnson's second interview, he told detectives he and three others were at the shooting scene. Williams had arrived in a black BMW driven by Mayfield. Johnson admitted possessing a nine-millimeter handgun. He claimed, however, he left before the girls were shot and returned to Lewis's house. Johnson believed that Lewis shot Nazerah Bugg. Johnson signed photographs identifying others involved in the shooting.

In his third interview, Johnson said he gave his gun to another gang member after those involved in the shooting met at Lewis's house. The other gang member disposed of the guns by throwing them into the river.

A-1139-17T4

The court permitted the State to read portions of a video-recorded statement of a person named Mustahim Camel after Camel recanted at trial. Camel said he told co-defendant Dennis that Dion did not really get shot, just hit with "a little piece of bullet." Dennis responded, "like damn, he made us do that shit to those girls[.]"

## II.

## A.

We begin our analysis with co-defendants' challenge to the prosecutor's use of his peremptory challenges to strike the prospective black jurors. During the first two and one-half days of jury selection, the court and counsel conducted voir dire of three panels of prospective jurors. To qualify to serve on the jury, all jurors answered questions on a questionnaire. They were asked follow-up questions by the court. For example, they were asked whether they could keep an open mind or still be fair and impartial even though the victims in the case were teenagers; whether they could decide the case only on the evidence even if they heard references to gang activity; whether they had any difficulty with concepts such as the presumption of innocence and the right of a criminal defendant not to testify; and whether they thought the criminal justice system is fair and effective.

A-1139-17T4

Thirty-three panelists qualified to serve on the jury, having satisfied the court and counsel they could fairly and impartially decide the case based on the facts presented during trial and the court's instructions on the law. Of the thirty-three, three were black. The court seated the first fifteen prospective jurors, had them respond to additional voir dire, and had them provide information about their backgrounds. The State, co-defendant Johnson, and co-defendant Dennis, respectively, began to exercise their peremptory challenges, one by one. If a party exercised a peremptory challenge and excused one of the fifteen seated jurors, the excused juror would be replaced with another qualified juror, and the next party in sequence would decide whether to exercise a peremptory challenge.

Among the first fifteen prospective jurors seated, two were black. They were seated in seats seven (Juror 7) and twelve (Juror 12). The parties exercised, one by one, in sequence, four peremptory challenges without objection. The prosecutor exercised his second peremptory challenge to excuse Juror 12 and his fourth peremptory challenge to excuse Juror 7. By the time he exercised his fourth challenge, the third black prospective juror (Juror 14) had been selected. She had replaced the juror in seat fourteen after co-defendant Johnson used his third peremptory challenge to excuse the juror previously seated there.

10

After the prosecutor exercised his fourth peremptory challenge to excuse the second black prospective juror, and co-defendants exercised their fourth peremptory challenges, the prosecutor announced the jury was acceptable to the State. Co-defendants exercised their fifth peremptory challenges. For a second time, the prosecutor announced the jury was acceptable to the State. Co-defendants exercised their sixth peremptory challenges. For a third time, the prosecutor announced the jury was acceptable to the State.

Co-defendant Johnson exercised his seventh peremptory challenge. Co-defendant Dennis announced the jury was satisfactory to him. The prosecutor then exercised his fifth peremptory challenge to excuse the remaining black prospective juror, Juror 14. Co-defendants immediately objected. They asserted at sidebar the prosecutor had exercised his peremptory challenges in a discriminatory manner, had excused the only three black prospective jurors, and had thereby deprived them of their constitutional right to an impartial jury.

The court heard argument but did not rule. It temporarily delayed further discussion of the issue. Following the sidebar discussion, co-defendant Johnson exercised his eighth peremptory challenge, exhausting the qualified prospective jurors. The court recessed for lunch and resumed argument following the lunch break. The next day, from a fourth panel of prospective jurors, the parties

11

completed the jury selection process without exercising any additional peremptory challenges.

The court twice conducted argument about the prosecutor's exercise of his challenges to exclude black prospective jurors: first at the initial sidebar conference following the defense objections, and again after the luncheon recess. To put the arguments into perspective, we digress to discuss the backgrounds of Jurors 7, 12, and 14.

Juror 7 said she could keep an open mind and be fair and impartial even though the victims in the case were teenagers. She said she could decide the case based on the facts presented, and not be influenced by any reference to gang activity. Asked if she thought "our system of criminal justice is fair and effective," she replied: "I guess so. . . . I haven't been a part of the system. So I don't know." The court responded, "well, let me put it this way. You know, in our system a defendant does not have to prove he's innocent. The State has to prove he's guilty. Are you okay with that?" The juror replied she was. The court asked if she knew a defendant did not have to testify, "doesn't have to give any evidence, doesn't even have to be here. It's the State that has to prove everything. Are you okay with that concept?" Again, Juror 7 replied, "yes." Asked why she would make a good juror, Juror 7 responded she had to "be on

12

an even playing field." She further explained, "I can't put any biases up." The court responded that's all anyone could ask.

Juror 7, who had children, was an accountant who worked "in mutual funds" for a large company. She enjoyed traveling and antigravity yoga. She also enjoyed watching public television, cooking shows, and decorating shows. She listened to news on a local channel and read the news on her cellular phone.

When initially qualified to serve on the jury, Juror 12 said she once sat on a grand jury. Asked if she had any family or friends in law enforcement, she responded she had a sister who was a member of the Department of Corrections, but that relationship would in no way affect her ability to be fair to either side. She maintained that she could be fair and impartial even though the victims were teenagers, and she said she would be able to decide the case uninfluenced by any evidence she heard about gang membership.

Juror 12 explained that she thought she could be a fair juror because of her managerial position at work. She was the customer service manager for a health care plan. In that capacity, she deals with a variety of people and must be fair and impartial to them.

The court next asked if Juror 12 thought the system of justice was fair. According to the record, she replied "yes." The following colloquy ensued:

THE COURT: Okay. You -- little hesitation. Tell me when –

[JUROR 12]: I'm a little hesitant –

THE COURT: It's not. Let's put it that way.

[JUROR 12]: Because having not been a part of the system I can't really say for certain that you know it is or it isn't.

THE COURT: Okay.

[JUROR 12]: I'm just hearing different things when -- in my opinion when I see certain things it's like I would have maybe judged that a little differently. Maybe I don't think that you looked at the evidence as impartially as you should have. It's just –

THE COURT: Do you have any particular instance where you -- think of that or?

[JUROR 12]: Not really. No.

THE COURT: Okay. If you were here in this case could you decide the case based solely on the evidence?

[JUROR 12]: And that's what I think it should be based on.

THE COURT: Okay.

[JUROR 12]: Just the evidence.

THE COURT: And you know in our system the defendant or defendants do not have to prove their innocence –

14

[JUROR 12]: Oh I'm clear –

THE COURT: You're okay with that?

[JUROR 12]: Yes.

THE COURT: Okay. Why do you think you might make a good juror?

[JUROR 12]: Because I believe on being partial [sic] and fair.

THE COURT: Being partial or impartial?

[JUROR 12]: And -- and fair.

THE COURT: Impartial? Impartial –

[JUROR 12]: Impartial and fair. I'm sorry.

THE COURT: Okay. That's -- no. No.

[JUROR 12]: Just my –

THE COURT: Just want to make sure. No, no, no. Okay. Good. What I'm going to ask you to – go ahead. Question. Go.

[PROSECUTOR]: You hesitated about our system (indiscernible) I didn't really hear an explanation.

[JUROR 12]: Because I know that there are times when it is not fair. You know? So, for me to be -- to come and say yes I believe that the system[']s fair (indiscernible) at all times. That's not always true.

[PROSECUTOR]: What -- at what times was the system not fair? At what time specifically did you see

something or know something that you felt was unfair?

[JUROR 12]: Well, it depends. There's -- just in terms of things I've seen on television and cases that I felt as though it wasn't handled as fairly as –

[PROSECUTOR]: What would be those cases? What type of cases? Obviously something stood out.

[JUROR 12]: I -- I really can't say. I don't -- to be honest with you.

THE COURT: Okay. All right. As long as you tell us that you would decide the case based on what happens in the courtroom.

[JUROR 12]: I -- in my -- course of every -- my daily dealings with people I have to deal with them based on that particular situation –

THE COURT: Okay.

[JUROR 12]: I can't pre-judge them. I can't deal with what happened in their lives in the past. I have to deal with them based on our interactions today.

Juror 12 had three adult children, all doing well in their callings. She enjoyed traveling. She enjoyed watching The Voice, American Idol, and So You Think You Can Dance on television, and she watched local news channels.

Juror 14 worked as a traffic manager of commercial operations for a cable network. She was not married, and she had no children. She enjoyed going to the movies, going to concerts, and hanging out with friends. Television shows

A-1139-17T4

she watched included "SVU, Chicago P.D., [and] the Housewives." She watched news on CNN and NBC.

During the sidebar conference immediately following the prosecutor's striking of Juror 14, the court found a pattern such that the prosecutor was required to explain his reasons for striking the three potential black jurors. We quote the ensuing colloquy.

> [PROSECUTOR]: Once again, Your Honor, (indiscernible) individual (indiscernible) characteristics of the (indiscernible) as far as employment, experiences, law enforcement, people that they know that did the crimes. I would note -- I would note I have said satisfactory three times, allowing this jury to be consisted -- to be constituted as is. That makeup was tampered with by the defense in their strategy to (indiscernible) based on my belief of conservative white males. I've also indicated that I have struck, for the record, two white women. (Indiscernible) notes I would, once again, place on the record that [counsel for Johnson] has struck four white men, one white woman, one Hispanic male. [Counsel for Dennis] has struck four white men, and two Hispanic men, and one Asian man.
>
> THE COURT: So is it -- the reason that you're striking the black jurors is because defense struck –
>
> [PROSECUTOR]: Correct.
>
> THE COURT: -- white jurors? Not for anything having to do particularly with the juror?

A-1139-17T4

[PROSECUTOR]: Correct.  I -- I based my – I based my observations on my jury, negatives and positives and flatlines.  Basically, people that are not negative and positive.  With th-- I have said satisfactory three times. I was satisfied.  It is the striking of the additional people that caused my – my percentages and my numbers to change as far as the value of each individual juror.

    . . . .

[PROSECUTOR (to Defense Counsel)]:  I did not use race.   By you striking jurors that I found favorable, I needed to reconstitute the jury.

THE COURT:  Okay.  I know you need to reconstitute.  But you're reconstituting -- you're saying -- you're telling me that you're deliberating [sic] reconstituting to strike black jurors because white jurors were struck.

[PROSECUTOR]: No.

THE COURT: That's what –

    . . . .

[PROSECUTOR]: No. No. No.

THE COURT: That's what I thought you said.

[PROSECUTOR]:  I'm –

THE COURT:  Please explain that then.

[PROSECUTOR]:   No. I'm saying I noted their patterns. I -- I believe that they have a pattern.

THE COURT: Right.

[PROSECUTOR]: I have no -- I have -- I have individual reasons based on life experience in this, based on whether they know police, do not know police, based on all the questions you asked.

THE COURT: Can you be specific, if you can, from your notes for each one of those jurors?

[PROSECUTOR]: Okay. Let me see. That would be –

THE COURT: All right. It's Juror Numbers 12, 7, and 14. I can give you the names if you want. 12 . . . was the first one.

    . . . .

[PROSECUTOR]: She was a -- let's see. I noted that she was nicely dressed. She's (indiscernible). She was hesitant on -- on her fairness questions. When I specifi-- when I specifically asked her to say her reasons on why, she hesitated on whether or not she could be fair. She -- and I asked her for spec-- specific ideas. She was not able to provide specific ideas and just said general.

THE COURT: Okay. And as to Juror Number 7 . . .

    . . . .

[PROSECUTOR]: I noted [she]-- had an eight and [sixteen-year-old] daughter. I noted, based on her -- her dress, her attitude, and her responses to questions, do not find her as a (indiscernible) -- a strong juror for me.

THE COURT: Okay. And, finally, it would be Juror Number 14.

19

. . . .

[PROSECUTOR]: She does not have kids. She's not married. I believe that it would be a -- it would be a negative for my -- for my jury selection. I would like to also note that her style of dress, her style of hair was more a young attitude, a more permissive attitude. (Indiscernible).

Following the morning recess, the court continued its inquiry. After hearing from defense counsel, the court indicated it had listened to the "sidebar system" during the luncheon recess, and there may have been a problem. Concerned about the record, the court asked the prosecutor to reiterate his reasons for striking the three black prospective jurors. The prosecutor gave the following reasons:

[PROSECUTOR]: [Juror 12], she was hesitant on the fairness question.

THE COURT: Okay.

[PROSECUTOR]: Could she be fair? Does she think the sys-- could -- the system is fair. When I asked her for specifics, she avoided answering on the specifics. I asked her for an example. She could not provide an example. That was, I guess –

THE COURT: Okay.

[PROSECUTOR]: -- the chief reason.

THE COURT: Okay. But again, I'm only doing this –

20

[PROSECUTOR]:  Right.

THE COURT: I'm -- I'm not asking you just to restate it because I want you to either enhance it or I didn't get it. It is because I am concerned –

[PROSECUTOR]:  Right.

THE COURT: -- that the record is not preserved. So –

[PROSECUTOR]:  Okay.  Now, there are things that I noted that she's not -- she's never been a victim of a crime.  She does have a Department of Corrections sister.  I'm not sure if that plays well or not but that's –

THE COURT: Okay.

[PROSECUTOR]:  My main reason is that she avoided answering the question on specific.  The next one would be who? I'm not –

THE COURT: Number 7 . . . She was the accountant, I believe.

[PROSECUTOR]:  Yes.

        . . . .

[PROSECUTOR]: [She] does not know any police officers.  I believe that she is -- she says that she believes in even playing.  She was not a negative for me.  She was a flat line.  But when the jury makeup changed, I want more positives.  I want more up arrows than down arrows.  So it wasn't anything.  I noticed the -- that she wore a hairstyle which was much more, I would say, liberal in attitude.  The -- there's also -- I also look for youth.  There was a – a hairdresser that's very youthful that -- on the jury.  Those are things I'm

21

concerned about. I'm concerned about, do -- or do they have life experience? Do they have -- or do they have a – a - - an entrusted value in the community? So I saw her as not a negative. I saw her as a -- as a pretty much a blank –

THE COURT: Okay.

[PROSECUTOR]: -- and -- but when -- when I said, satisfied, satisfied, satisfied, at one of those times, counsel str-- struck a very favorable State juror. And then I looked at my list again –

THE COURT: And that -- that's Number 14 . . .

. . . .

[PROSECUTOR]: No children, not married. I had -- again, I noticed a -- she seemed youthful. She seemed -- her hairstyle, her clothing. She seemed young. I think she said she liked going out. I'm not sure. She said, no kids, not married. I want people who are vested in the community. I want people that have a stake in the community. She also was -- I can note for the record. She was not a negative. She was not a down - - a down spiral. I'm sorry. She was not a down arrow. She was a question mark.

Defense counsel reiterated the prosecutor had struck all three black prospective jurors. They pointed out inconsistencies in the prosecutor's explanations. Following argument, the trial court determined "the State ha[d] met its burden . . . of offering reasons that are race neutral for striking the jurors in question[.]"

## B.

In its oral opinion, the court reiterated co-defendants had established a prima facie case so as to shift the burden to the prosecutor to explain his reasons for excusing the jurors. The court noted it had given the prosecutor the opportunity both before and after the break to explain his reasons for excusing the jurors.

Next, the court recounted the reasons the prosecutor gave for striking the three jurors. The court noted "there was no objection from the defense – not that there had to be but there was no objection with the initial striking of Juror 12 and the second striking of Juror 7." The court noted the prosecutor did say the jury was satisfactory three times before striking the last black prospective juror.

The court continued:

> And I find that the State has met its burden over the objection of the defense of . . . offering reasons that are race neutral for striking the jurors in question, particularly as to Juror 12, that she was hesitant. Again, she may have been acceptable but . . . the jury make-up changes once there are challenges exercised. Somebody may be quasi acceptable or acceptable and then it changes . . . when a challenge is made.
>
> Same thing with Juror 7 and Juror 14. Whether there are inconsistencies, I don't find it as the - - that there are race consistencies or there are race - - this was

a race or any other unconstitutional exercise or deliberate exercise by the State. I find actually the opposite. That the State gave reasons that are legitimate, or not pretexts, to use the . . . peremptory challenge.

I and I do find . . . and I rely particularly upon as I said three times after no objection from the defense, three times the State found as satisfactory the jury. That had the defense found satisfactory would have included Juror 14, the African American, which ultimately the State challenged, which . . . prompted the objection.

So I am going to deny the Gilmore[4] challenge over the objection of the defense and we're going to continue with jury selection. There is no remedy because there is no breach is what my finding is.

### C.

Co-defendant Johnson argues the trial court's ruling was clearly mistaken. He points out the prosecutor used the majority of his peremptory challenges to strike the only three prospective black jurors. He adds that but for their race, the jurors were, "in all respects, as heterogeneous as the community as a whole." He cites the occupations of each of the three, as well as their expressed declarations they could fairly and impartially judge the case on the evidence

---

[4] State v. Gilmore, 103 N.J. 508 (1986).

A-1139-17T4

alone. He also points out that Juror 7's "hesitation" was based on her inexperience with the legal system, not any preconceived notion or prejudice.

Co-defendant Dennis emphasizes the inconsistencies in the prosecutor's reasons. For example, he points out the prosecutor justified his challenge of Juror 7 in part based on her having two daughters, her attire, her attitude, and her liberal hairstyle, when in fact the juror had a daughter and a son, not two daughters. Unlike Juror 7, who the prosecutor struck in part because she had children, he claimed to have excused Juror 14 in part because she was not married and had no children.

Johnson argues—and Dennis echoes—that either having children or having no children is not a factor indicative of the situation-specific bias that would justify the challenge of prospective jurors. Johnson adds that the prosecutor's reliance upon his evaluation of grooming, attire, and hairstyles of prospective jurors also fails to rise to the level of situation-specific bias which might prevent the juror from impartially deciding a case.

The State responds by repeating in detail the reasons the prosecutor excused each of the black prospective jurors. The State insists that each expressed reason was a valid, non-discriminatory basis for exercising a

peremptory challenge, and the trial judge's ruling so finding was not clearly erroneous.

## D.

Our Supreme Court has eloquently noted the paramount importance of a fair trial:

> One of our most cherished rights is the right to trial by a fair and impartial jury. We zealously guard that right by, among other things, requiring that the jury selection process be free of racial or ethnic taint. When it has been discerned that impermissible bias has infected the selection of a jury, we have not hesitated to excise that cancer and require a new trial, one where prejudice and hatred have no place.
>
> [State v. Osorio, 199 N.J. 486, 492 (2009).]

A defendant is entitled to a jury composed of peers or equals. Batson v. Kentucky, 476 U.S. 79, 86 (1986). The United States and New Jersey Constitutions prohibit the use of peremptory challenges to strike a juror based on his or her race. Id. at 96; Gilmore, 103 N.J. at 521-22. "Under both the United States and New Jersey Constitutions, the determination of whether the prosecution has exercised peremptory challenges in a discriminatory matter involves a three-step procedure." State v. Clark, 316 N.J. Super. 462, 468 (App. Div. 1998).

A-1139-17T4

The first step requires that a defendant overcome the presumption of constitutionality of a peremptory challenge by "producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred[.]" State v. Thompson, 224 N.J. 324, 343 (2016) (quoting Johnson v. California, 545 U.S. 162, 170 (2005)). A defendant can satisfy this first step by showing an

> opponent has struck most or all of the members of the identified group from the venire[;] whether the opponent has used a disproportionate number of his peremptories against a group[;] whether the jurors in question share only this one characteristic – their membership in the group – and that in all other respects they are as heterogeneous as the community as a whole[;] whether the opponent failed to engage those same jurors in more than desultory voir dire, or indeed to ask them any questions at all[;] and although the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule[,] whether he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong[.]
>
> [Osorio, 199 N.J. at 503-04 (alterations in original) (citations omitted).]

Once a defendant has produced such evidence and thus made a prima facie showing, "this in effect gives rise to a presumption of unconstitutional action that it is the burden of the prosecution to rebut." Gilmore, 103 N.J. at 537. The prosecution must "come forward with evidence that the peremptory challenges

27

under review are justifiable on the basis of concerns about situation-specific bias." Thompson, 224 N.J. at 341 (quoting Gilmore, 103 N.J. at 537). "To carry this burden, the State must articulate 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." Gilmore, 103 N.J. at 537 (quoting Tex. Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)).

> The trial court must decide whether these are, on the one hand, genuine and reasonable grounds for believing that potential jurors might have situation-specific biases that would make excusing them reasonable and desirable, given the aim of empanelling a fair and impartial petit jury, or, on the other hand, "sham excuses belatedly contrived to avoid admitting acts of group discrimination."
>
> [Id. at 537-38 (quoting People v. Wheeler, 583 P.2d 748, 765 (Cal. 1978)).]

"[T]he trial court must make specific findings with respect to the prosecution's proffered reasons for exercising any disputed challenges. The court must consider whether those reasons are 'reasonably relevant to the particular case on trial or its parties or witnesses.'" Clark, 316 N.J. Super. at 473 (quoting Gilmore, 103 N.J. at 538). It is essential the trial court make "separate findings . . . with respect to each disputed challenge." Ibid. If the State's explanations appear to be genuine, they "should be accepted by the court,

28

which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual." Thompson, 224 N.J. at 341 (quoting Gilmore, 103 N.J. at 538).

In the third step, "the trial court must judge the defendant's prima facie case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." Ibid. (quoting Gilmore, 103 N.J. at 539). This final step requires the trial court to "assess, among other things, whether the State has applied the proffered reasons 'even-handedly to all prospective jurors'; the 'overall pattern' of the use of peremptory challenges; and 'the composition of the jury ultimately selected to try the case.'" Id. at 343 (quoting Osorio, 199 N.J. at 506). In Osorio, the Court explained:

> [a] nondiscriminatory reason for exercising a peremptory challenge which appears genuine and reasonable on its face may become suspect if the only prospective jurors with that characteristic who the [party exercising the peremptory challenge] has excused are members of a cognizable group.
>
> In addition, the court must consider the overall pattern of the [party's] use of its peremptory challenges. Even if the reasons for each individual challenge appear sufficient when considered in isolation from the . . . other challenges, the use of a disproportionate number

of peremptory challenges to remove members of a cognizable group may warrant a finding that those reasons are not genuine and reasonable.

Finally, the court must consider the composition of the jury ultimately selected to try the case. Although the presence on the jury of some members of the group alleged to have been improperly excluded does not relieve the trial court of the responsibility to ascertain if any prospective juror was peremptorily challenged on a discriminatory basis, this circumstance may be highly probative of the ultimate question whether the . . . proffered nondiscriminatory reasons for exercising peremptory challenges are genuine and reasonable.

[199 N.J. at 506 (quoting Clark, 316 N.J. Super. at 474).]

We will uphold the trial court's ruling on whether the prosecution has exercised its peremptory challenges on constitutionally impermissible grounds unless it is clearly erroneous. Thompson, 224 N.J. at 344. The standard of review "necessarily applies to the trial court's assessment of the prosecutor's candor and sincerity in the presentation of reasons for exercising peremptory challenges." Id. at 345 (citing State v. Williams, 113 N.J. 393, 411 (1988)).

In the case before us, the trial court applied the first analytical step and determined co-defendants had overcome the presumption the prosecutor was exercising his peremptory challenges in a constitutionally impermissible manner. That determination is adequately supported by the record. Co-

defendants were members of the excluded group, the prosecutor struck all members of the identified group, and the prosecutor used a disproportionate number of his peremptory challenges against the group. Osorio, 199 N.J. at 503-04. The State does not challenge the trial court's determination of this first analytical step.

This finding gave rise to the presumption the prosecutor had exercised his peremptory challenges in an unconstitutional manner, thus shifting the burden to the prosecution to rebut that presumption. Gilmore, 103 N.J. at 537. The prosecutor was required "to come forward with evidence that the peremptory challenges under review were justifiable on the basis of concerns about situation-specific bias." Thompson, 224 N.J. at 341 (quoting Gilmore, 103 N.J. at 537). To carry that burden, the prosecutor was required to "articulate 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." Gilmore, 103 N.J. at 537 (quoting Tex. Dep't. of Cmty. Affairs, 450 U.S. at 258). He was required to show his reasons for exercising the disputed challenges were reasonably relevant to the particular case on trial or its parties or witnesses, and the court was required to consider whether the proffered reasons were relevant to the case or its parties or

witnesses.  <u>Clark</u>, 316 N.J. Super. at 473.  The prosecutor failed to make such a showing and the court failed to make such findings.

Subjected to either cursory consideration or close scrutiny, it is difficult to discern how the prosecutor's proffered reasons for striking the three black jurors were justifiable on the basis of concerns about "situation-specific bias[,]" <u>Thompson</u>, 224 N.J. at 341, assuming the term bias is understood in its ordinary sense, namely, "[g]enuine prejudice that a judge, juror, witness, or other person has against some person or relevant subject." <u>Black's Law Dictionary</u> 198 (11th ed. 2019).  The majority of reasons expressed by the prosecutor can hardly be characterized as specific.

The prosecutor's overarching theme was that as co-defendants exercised peremptory challenges, and thereby "reconstituted the jury," he was forced to use his peremptory challenges in an effort to obtain a jury more favorable to the State.  The record makes clear the prosecutor's perception of a jury more favorable to the State was one with a significant number of conservative white males.  The prosecutor not only said as much, but when he returned after the luncheon recess, having been challenged for striking black jurors, he insisted the court query co-defendants about their reasons for striking white jurors. He insisted the court rule on his application even after the court rejected co-

defendants' claim the prosecutor had used his peremptory challenges in an unconstitutional manner.

Next, in response to the trial court's question, the prosecutor said the reason he was striking black jurors was because the defense was striking white jurors. Although he later denied doing so, it is clear from the record the trial court understood him to say just that. For after the prosecutor explained the need to reconstitute the jury based on co-defendants' exercise of peremptory challenges, and the court asked the prosecutor if he was deliberately reconstituting by striking black jurors because white jurors were struck, the prosecutor denied doing so. The court responded, "[t]hat's what I thought you said."

In any event, after denying he used race as a factor, the prosecutor explained he based his decisions on his system of rating jurors as "negative and positives and flat lines." The record is devoid of any evidence of the criteria the prosecutor used to determine whether a juror was a positive, negative, or a flat line. In analytical terms, the prosecutor's explanation of his rating system lacked any semblance of being "justifiable on the basis of concerns about situation-specific bias." Osorio, 199 N.J. at 504. The prosecutor's generic explanation of his rating system did not include "clear and reasonably specific explanations

of . . . legitimate reasons for exercising each of the peremptory challenges." Ibid.

The prosecutor's explanations for striking specific jurors were nearly as thin. On the surface, the one arguably reasonable explanation the prosecutor gave was for striking Juror 12. He claimed he struck Juror 12 primarily because "she was hesitant on the fairness question." He added that when he asked for specifics, she avoided answering on the specifics.

The prosecutor's explanation was not based on an entirely accurate memory of Juror 12's responses. She never hesitated about whether she could be fair. She hesitated when asked, "do you think our system of criminal justice [is] fair and effective?" Juror 12 explained her hesitancy: "Because having not been a part of this system, I can't really say for certain that you know it is or it isn't." Juror 7 had given a similar answer. Asked if she thought the system of criminal justice was fair and effective, Juror 7 replied, "I guess so. . . . I haven't been a part of the system. So I don't know." The prosecutor did not strike Juror 7 because of her inexperience with jury service.

In response to the prosecutor pressing for specifics, Juror 12 said she had seen things that caused her to believe she "would have maybe judged that a little differently." She could not recall where she had seen such things; perhaps on

34

television. She could recall no other details. It was her inability to recall specifics the prosecutor cited as the primary reason for striking Juror 12. Although perhaps the reason is legitimate, one is hard-pressed to understand how Juror 12's responses gave rise to "genuine and reasonable grounds for believing [Juror 12] might have situation-specific biases that would make excusing [her] reasonable and desirable, given the aim of empanelling a fair and impartial petit jury[.]" Gilmore, 103 N.J. at 537-38. Significantly, the prosecutor did not explain how Juror 12's inexperience in serving on a jury or lack of recall about certain details were reasonably relevant to the case or parties or witnesses.

The prosecutor's reasons for striking Jurors 7 and 14 were less specific but more contradictory than his reasons for striking Juror 12. His reasons for striking Juror 7 included his mistaken belief that she had two young daughters—she had a son and a daughter—and his reasons for striking Juror 14 included that she had no children. He noted Juror 7 knew no law enforcement officers after previously having noted Juror 12 had a sister in law enforcement, a corrections officer.

The prosecutor's primary reasons for striking Jurors 7 and 14 were their appearances. He struck Juror 7 because, among other reasons, "she wore a

35

hairstyle which was, I would say, liberal in attitude." She apparently was also young, and thus, in the prosecutor's mind, lacking in life experience and "an entrusted value in the community." Similarly, he noted Juror 14 seemed "youthful," apparently based on her hairstyle and clothing, and she liked going out. He repeated he wanted people who were vested in the community, but he did not say how such "investment" is determined or what community he envisioned.

The prosecutor gave no specifics about Juror 7's hairstyle, short or long, straight or curled, natural or dyed, let alone an explanation of how a hairstyle is indicative of someone "liberal in attitude." He gave no specifics about Juror 14's hairstyle. More significantly, he did not explain how such generalities, founded or unfounded, gave rise to concerns about situation-specific bias implicating empaneling a fair and impartial jury, or how they were relevant to the case at hand.

Significantly, even under the prosecutor's vague, unexplained rating system, neither Juror 7 nor Juror 14 was a "negative." According to the prosecutor, Juror 7 was not a negative, but rather "pretty much a blank," and Juror 14 was not a "down arrow" but rather "a question mark." These characterizations are tantamount to a statement the prosecutor did not have a

36

bona fide belief that either Juror 7 or 14 had a situation-specific bias that would make excusing them reasonable and desirable, given the aim of empaneling a fair and impartial jury. The characterizations were contradictory to the notion the prosecutor's reasons were relevant to the case, the parties, or the witnesses.

The trial court's analysis of the prosecutor's proffered reasons was also inadequate when measured by State constitutional standards. In its opinion, after recounting the prosecutor's explanations for striking black jurors and the sequence in which the prosecutor exercised its challenges, the court provided little more than conclusory statements upholding the prosecutor's exercise of peremptory challenges. The court explained:

> I note that there was no objection from the defense --
> not that there had to be but there was no objection with
> the initial striking of Juror Number 12 and the second
> striking of Juror Number 7. After that, the State did
> three times say that the jury was pr-- was -- was
> satisfactory as presently constituted with Juror Number
> 14 on. And I find that the State has met its burden over
> the objection of the defense of -- of -- of -- of offering
> reasons that are race neutral for striking the jurors in
> question, particularly as to Juror Number 12, that she
> was hesitant. Again, she may have been acceptable but
> the -- the jury makeup changes once there are
> challenges exercised. Somebody may be quasi
> acceptable or acceptable and then it changes. And I --
> when a challenge is made. Same thing with Juror
> Number 7 and Juror Number 14. Whether there are
> inconsistencies, I don't find it as the -- that there are
> race consistencies or there are race -- this was a race or

any other unconstitutional exercise or deliberate exercise by the State. I find actually the opposite. That the State gave reasons that are legitimate, are not pretexts to use the peremp--peremptory challenge. And I do find -- and -- and I rely particularly upon, as I said three times after no objection from the defense, three times the State found as satisfactory the jury. That had the defense found satisfactory would have included Juror Number 14, the African American, which ultimately the State challenged, which -- which prompted the objection. So I am going to deny the [Gilmore] challenge over the objections of the defense and we're going to continue with jury selection. There is no remedy because there is no -- no breach is what my finding is.

That co-defendants did not object the first two times the prosecutor excused black jurors is of little significance. The pattern may not have been apparent at that time. And though the prosecutor may not have disturbed one black juror had co-defendants not exercised the number of challenges they did, the court was nonetheless required to consider whether the prosecutor's reasons were "reasonably relevant to the particular case on trial or its parties or witnesses." Clark, 316 N.J. Super. at 473. This, the court did not do. Rather, the court did little more than conclude the prosecutor had offered race neutral reasons for striking the jurors in question.

In addition, as part of the third analytical step, the trial court was required to assess whether the State applied the "proffered reasons" even-handedly.

Osorio, 199 N.J. at 506.   The trial court was also required to consider the prosecutor's overall pattern of the use of peremptory challenges and the composition of the jury ultimately selected to try the case.  Thompson, 224 N.J. at 343.  The record establishes the jury was devoid of black jurors.  It does not establish whether co-defendants were tried by an all-white jury.

The trial court's analysis, as well as the prosecutor's reasons, may have satisfied the federal constitutional paradigm for determining the issue.   Under the federal constitutional analysis, "'[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."  Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam)).   In fact, under federal law, the prosecutor's explanation can even be "silly" or "superstitious" so long as it is not discriminatory.  Purkett, 514 U.S. at 768.

We understand the three-step paradigm is more exacting under New Jersey's Constitution than the analysis required by federal constitutional standards.  Clark, 316 N.J. Super. at 468-71.   Indeed, our Supreme Court has recognized that its three-step analytical construct may in some instances cause

an attorney caution when exercising peremptory challenges. The balance struck is appropriate:

> It may be that discrimination in the courtroom cannot be eradicated without incurring costs. If the cost is some constraint on counsel's otherwise unbridled freedom in selecting jurors, we believe that it is a price worth paying. The alternative, that counsel could exclude a potential juror merely because the juror is a member of a cognizable group, is unthinkable.
>
> [State v. Watkins, 114 N.J. 259, 267 (1989).]

If the inadequacy of the trial court's analysis were the only issue before us, we would need to consider the feasibility of a remand to supplement the record. See Osorio, 199 N.J. at 509 ("Coupled with the passage of more than seven years since jury selection, the effect of that delay on the recollection of the participants, and the incompleteness of the record resulting therefrom, the absence of a searching judicial review of [relevant] factors forecloses the meaningful examination of any contest of the State's exercise of peremptory challenges in this case. In those circumstances, and given the precious constitutional rights at stake, we eschew any intermediate measures. In the end, because the scant record before us does not instill confidence that the trial court properly exercised its discretion in assessing the propriety of the contested peremptory challenges, we are left with no reasonable or significant alternative

to the remedy aptly ordered by the Appellate Division: vacating defendant's convictions and remanding the case for a new trial."); see also State v. Gomez, 341 N.J. Super. 560, 579 (App. Div. 2001) (suggesting recusal may be appropriate on remand if the trial court has made findings concerning certain of the State's proof of an evidentiary issue).  In view of our determination the prosecutor did not rebut the presumed unconstitutionality of his exercise of peremptory challenges, we need not determine whether a remand is necessary. Rather, we reverse and remand for a new trial.

III.

Co-defendants argue they were unduly prejudiced by the court's refusal to instruct the jury, as co-defendants requested, on the defense of third-party guilt. The trial court declined to charge the jury on third-party guilt because the State alleged that co-defendants were guilty based upon accomplice liability.  The court reasoned that regardless of which gang members actually shot the victims, many gang members were at the scene and participated in some way in the shootings.  The court decided that given the circumstances of the shooting and the State's theory of the case, the third-party guilt charge would confuse the jury, particularly in view of the accomplice liability charge.

41

Indisputably, accurate and understandable jury instructions are essential to a fair trial. State v. Savage, 172 N.J. 374, 387 (2002). Jury instructions should include an explanation of the law as it relates to the material facts of the case, operating like a road map to guide the jury. Ibid. Flawed instructions on material issues constitute reversible error. State v. Grunow, 102 N.J. 133, 148 (1986). However, defendants are not entitled to have the jury charged in their own words. State v. Thompson, 59 N.J. 396, 411 (1971).

Proper jury instructions are at times necessary to ensure a defendant is afforded the opportunity to present a complete defense. A defense can include evidence of third-party guilt. State v. Cope, 224 N.J. 530, 551 (2016); see also State v. Jimenez, 175 N.J. 475, 486 (2003) (stating that a defendant is entitled to show that someone else committed the crime); State v. Koedatich, 112 N.J. 225, 297 (1988) (explaining standard governing admissibility of evidence of third-party guilt). In State v. Sturdivant, 31 N.J. 165, 179 (1959), the Court explained:

> [a] defendant of course may seek to prove that another agency produced the death with which he is charged. It would seem in principle to be sufficient if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case. . . . We think it not enough to prove some hostile event and leave its connection with the case to mere conjecture. Somewhere in the total

42

> circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case. The question of relevancy ultimately rests in a sound exercise of discretion.

To be admissible, evidence of another's guilt does not need to be conclusive, and it "need not [constitute] substantial proof of a probability that the third person committed the act[.]" Jimenez, 175 N.J. at 486. However, the evidence cannot be speculative. Sturdivant, 31 N.J. at 179. A trial court must engage in a fact-sensitive analysis to determine whether the evidence of third-party guilt meets this requirement. State v. Cotto, 182 N.J. 316, 333 (2005). It bears repeating that a trial court has broad discretion to admit or preclude evidence of third-party guilt. Ibid.

Here, there is ample support for the court's decision to provide only the accomplice liability instruction and not the third-party guilt instruction. The theory of the State's case was that co-defendants were present at the scene and encouraged or facilitated the shootings. Although the jury instruction did not specifically name the principal shooter, based upon the evidence presented at trial, the shooter could have been any of the gang members who armed themselves and appeared at the scene along with co-defendants. There is no evidence from which the jury could have concluded the victims were shot by someone other than one of co-defendants' fellow gang members. And the court's

43

accomplice liability instruction made clear that to convict either co-defendant of a crime, the jury was required to find the accused had the purpose to participate in that particular crime.

In short, there was no rational basis for the court to provide a third-party guilt instruction. The trial court did not abuse its discretion by declining to so instruct the jury.

IV.

Co-defendant Johnson argues that his second and third statements to police should have been suppressed. He does not claim he was not given Miranda[5] warnings; rather, he claims the detectives who interviewed him repeatedly deflected his questions about whether he would be imprisoned if he requested a lawyer. We find no merit in his argument.

In his first statement—not at issue on appeal—Johnson said he and his friends were shot at earlier in the day. Nothing Johnson said warranted his arrest and he left.

Unlike his first interview, for the second interview Johnson was brought to the station in handcuffs. His interview was videotaped. His Miranda rights were read to him and he executed a Miranda rights waiver form. The transcript

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

of the interview evidences that Johnson was aware he would not have a lawyer with him, and he nevertheless agreed to speak with police. In fact, the detectives specifically informed him he could obtain a lawyer.

Although Johnson asked several times if he would be locked up if he requested a lawyer, and though the detectives did not specifically answer his question, he continually agreed to speak to the detectives. When he attempted to have the detectives agree to release him after they spoke, they remained evasive on the issue, but during the course of the interview, they offered to call his mother and to give him food, beverages, and cigarettes.

Detective Maldonado conducted Johnson's third interview a short time after the second. The interview was videotaped. The video shows that the detective explained to Johnson the Miranda warnings were still in effect, but that Johnson could waive his rights and continue to speak with the officers, which Johnson did.

Johnson testified at the suppression hearing. He claimed that on October 3, 2014, the date of his second interview, he was ambushed, cuffed, and taken to the police station again. He claimed the officers took him into the bathroom and questioned him there about the crime before they made the second interview video. According to Johnson, when the formal interview started, the officers

did not tell him that the interview would be recorded.  Although the officers read the Miranda form to him, he claimed he said he did not understand it.  He said that when he tried to read the form, the officers "snatched" it away from him. He testified he asked for a lawyer, but the detectives were not clear as to whether or not he would be held by police until the lawyer arrived.  He believed he would be incarcerated if he waited for an attorney.  Overall, he explained that he did not want to talk to the officers, but that he felt threatened into doing so.

On cross-examination, Johnson claimed the officers yelled at him during the first interview but admitted that the yelling was not displayed in the video of the first interview.  He claimed he was never physically threatened "on video," but the officers did physically touch him at other times, and Detective English "chok[ed] him up against the wall" at the time of the first interview. However, he admitted that neither he, his parents, nor his attorney reported the touching or filed a complaint.  In addition, he admitted that the alleged physical contact did not leave any bruising.

Johnson can read and write.  He graduated from high school without being held back and was an average student.  He was accepted into a local community college.  Although he was nineteen at the time of the shooting, he claimed that

he was not a "full grown-up." As to the Miranda document, he admitted that he signed it.

The trial court denied Johnson's suppression motion in a written opinion. As to the first interview, the court noted that Johnson did not appear to be nervous or frightened, but rather tired. At the beginning of the second interview, Johnson was read his Miranda rights. The court noted that a transcribing error indicated that Johnson initially said that he did not understand his Miranda rights before he admitted that he did. Specifically, the court concluded that Johnson said he "kind of" understood his rights, not that "I don't" understand. The court held that the wording difference was a transcription error.

The court found credible Detective Pearl's testimony that co-defendant Johnson was not a suspect at the time of the first interview. The court reviewed the totality of the circumstances to determine if Johnson's waivers of his Miranda rights in the second and third interviews were given knowingly, intelligently, and voluntarily. It concluded that Detectives Pearl, English, and Maldonado testified completely and directly, whereas Johnson testified in low tones to avoid being heard. Johnson's demeanor during the second interview indicated that he did not want to be heard on the recordings because he also spoke in low tones and wanted to avoid implicating his co-defendants. His

47

claims that he was physically assaulted by the officers did "not ring true" because his demeanor during the video showed that he was not in distress and was calm until he decided to implicate other persons in the homicide, at which time he became frightened and nervous.

Moreover, Johnson asked the officers for help because he was fearful of reprisals from others for "snitch[ing]." The court found he would not have done so if the officers had been threatening him. Finally, the court concluded that Johnson understood his Miranda rights and voluntarily waived them because he read and executed the form and, afterwards, he answered all the officers' questions without difficulty.

Generally, a confession made during a custodial interrogation is admissible if a defendant has been given Miranda warnings and has made a voluntary, knowing, and intelligent waiver of those rights. State v. Knight, 183 N.J. 449, 461-62 (2005); State v. DiFrisco, 174 N.J. 195, 235 (2002). A court will consider the totality of the circumstances to determine if an individual knowingly, voluntarily, and intelligently waived his or her rights. State v. Cook, 179 N.J. 533, 563 (2004); State v. Galloway, 133 N.J. 631, 654 (1993). The court will consider a multitude of factors, including the defendant's "age, education and intelligence, advice concerning constitutional rights, length of

detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Cook, 179 N.J. at 563; State v. Timmendequas, 161 N.J. 515, 614 (1999). It will also take into account the time that elapsed between when the Miranda warnings were given and the statement made. Knight, 183 N.J. at 463. The State must establish beyond a reasonable doubt that the statement was made voluntarily. Galloway, 133 N.J. at 654.

A reviewing court must determine if there was sufficient credible evidence to affirm the findings of fact made by the trial court. State v. Locurto, 157 N.J. 463, 470-75 (1999). Corrective action is only necessary when the trial court's findings are so wide of the mark that the interests of justice require intervention. State v. S.S., 229 N.J. 360, 381 (2017). A reviewing court should defer to the conclusions of the trial court in matters of witness credibility due to the opportunity to see, hear, and have a feel for the case. State v. Johnson, 42 N.J. 146, 161 (1964).

On appeal, Johnson claims he reasonably feared he could not obtain a lawyer without being incarcerated and, as a result, his second and third statements to police should have been suppressed. However, Johnson's questions about whether he would have to wait in jail while he waited for an

attorney to arrive did not negate his <u>Miranda</u> waiver.  The record demonstrates Johnson's questions about jail were motivated not by his desire to have an attorney present, but rather because he wanted the police to confirm that he could go home after the interview.  Johnson repeatedly stated that he wanted to speak to police even after asking his questions about the attorney.  By that time, Johnson had already been read his rights, confirmed that he understood them, and executed the <u>Miranda</u> waiver form.

Considering the totality of the circumstances, there is adequate support in the record for the trial court's conclusion that Johnson voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.  Moreover, the trial court was in a much better position than an appellate court to understand the context of the statements defendant points to now as the basis for his argument his waiver of <u>Miranda</u> rights was not voluntary.  Applying our standard of review, we find no error in the trial court's decision.

V.

We have considered co-defendants' remaining arguments in support of their attempt to obtain a new trial or acquittal and found them to be without sufficient merit to warrant further discussion.  <u>R.</u> 2:11-3(e)(2).  In view of our grant of a new trial, we need not address co-defendant Dennis's argument that

50

his sentence is grossly disproportionate to the sentences of others who later entered guilty pleas. Nor need we address co-defendant Dennis's guilty plea to the CDS offenses, as he has not challenged his plea on appeal.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1139-17T4